UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM WALSH,

        Plaintiff,

    v.

COREPOWER YOGA LLC,

        Defendant.

Case No. 16-cv-05610-MEJ

**ORDER RE: UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT; UNOPPOSED MOTION FOR ATTORNEYS' FEES AND COSTS**

Dkt. Nos. 28, 29

## INTRODUCTION

Plaintiff William Walsh ("Plaintiff") filed this putative class and collective action against Defendant CorePower Yoga LLC ("Defendant" or "CorePower") on October 3, 2016. *See* Compl., Dkt. No. 1. Pending before the Court are Plaintiff's unopposed (1) Motion for Certification of the Settlement Class, Final Approval of the Class Action Settlement, and Approval of the FLSA Settlement (Cert. Mot., Dkt. No. 28); and (2) Motion for Attorneys' Fees and Costs (Fees Mot., Dkt. No. 29). The Motions came on for hearing on July 13, 2017.

Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **GRANTS** the Certification Motion and **GRANTS IN PART** the Fees Motion for the reasons set forth below.

## BACKGROUND

### A.    Background

CorePower owns and operates dozens of yoga studios nationwide. To maintain its facilities and until approximately 2015, CorePower created and operated a "Yoga for Trade" ("YFT") program at dozens of studios in California and around the country. Through the YFT program, CorePower Yoga customers (called "students") worked approximately two- to three-hour scheduled weekly shifts during which they cleaned and performed other project-based work

at their local studio. In exchange, they received free yoga classes. CorePower did not pay these students ("YFT Cleaners") any wages for their work.

Beginning in late 2013, CorePower phased out the YFT program and replaced it with the Studio Experience Team ("SET"). Under the SET program, CorePower students continued to work regular weekly shifts of approximately one-and-a-half hours, but CorePower paid them an hourly wage for their work. Instead of receiving free yoga classes, however, Plaintiff alleges that SET Cleaners were required to apply a large portion of their wages towards the purchase of a discounted yoga membership at CorePower, which reduced their pay below the applicable minimum wage. Plaintiff worked for CorePower as both a YFT and SET Cleaner at one of CorePower's studios in Berkeley, California.

Plaintiff contends that CorePower violated wage and hour laws by: (1) failing to pay YFT Cleaners any wages for the hours they worked, in violation of California and the Fair Labor Standards Act ("FLSA") minimum wage provisions; and (2) paying California SET Cleaners subminimum wages by requiring them to purchase yoga memberships as a condition of work.

CorePower denies any wrongdoing, but agreed to settle these claims before Plaintiff filed suit. Plaintiff filed this action on behalf of the California Class and as a representative of the FLSA Collective.

The Court preliminarily approved the settlement, provisionally certified the proposed class and approved the FLSA Collective, and directed notice to Class and Collective members. *See* Prelim. Approval Order, Dkt. No. 21.

The Court held a final fairness hearing on July 13, 2017. *See* Dkt. No. 38 (minutes). As of the date of the hearing, four potential Class members objected to the settlement in writing, each on the ground that they had enjoyed the YFT and SET Programs and did not feel the lawsuit was warranted. *See* Turner Decl., Ex. G (Patton Decl.) ¶ 11 & Ex. B, Dkt. No. 30-7; Suppl. Patton Decl. ¶ 7, Dkt. No. 35. As of the date of the hearing, thirty-four potential class members requested they be excluded from the Class. Patton Decl. ¶ 10 & Ex. A; Suppl. Patton Decl. ¶ 5 & Ex. A.[1]

---

[1] In a Declaration submitted after the hearing to update the Court about a number of matters, including whether potential Class and Collective members who had received notice later had

No Class or Collective members appeared at the hearing.

**B.     Settlement Terms**

The terms of the Settlement Agreement are set out in full detail in the Preliminary

Approval Order.  *See* Prelim. Approval Order at 2-7.  The Settlement Agreement and Amendment

thereto are attached as Exhibits A and B to the Turner Declaration.  After the hearing, the parties

submitted by Joint Stipulation a second Amendment in response to the Court's concerns.  *See*

Suppl. Mem., Dkt. No. 43; Suppl. Patton Decl. ¶ 6 (Range of Payments); Minutes, Dkt. No. 49;

Stip. with Proposed Order, Dkt. No. 50; Order on Stip., Dkt. No. 51.  The Court summarizes the

key terms of the amended Settlement Agreement here.

The Settlement Agreement defines the "California Class" as all individuals who rendered

services to Defendant as YFT Cleaners or SET Cleaners in the State of California during the

California Class Period.  The Class Period applicable to the California Class is May 19, 2012

through February 14, 2017 (the date of the Preliminary Approval Order).  The "FLSA Collective"

is defined as "all individuals who rendered services to Defendant as YFT Cleaners during the

FLSA Class Period."  Individuals within the FLSA Collective are referred to as "FLSA Collective

Members."  The Class Period applicable to the FLSA Collective is May 19, 2013 through

February 14, 2017.  "YFT Cleaners" shall mean all individuals who worked for CorePower

cleaning studios in exchange for yoga classes pursuant to its YFT program during the applicable

Class Period.  "SET Cleaners" shall mean all individuals who worked for CorePower cleaning

studios in exchange for wages, pursuant to its SET program, during the California Class Period.

There are approximately 6,482 potential members of the FLSA Collective who participated

in the YFT program, and 4,873 California Class members who participated in the YFT program at

California CorePower studios.  Turner Decl. ¶ 21; Second Suppl. Turner Decl. ¶ 4, Dkt. No. 44.

United States District Court
Northern District of California

submitted additional objections or requests for exclusion, Counsel for Plaintiffs stated the Claims
Administrator had received no additional objections or exclusions, and had received one additional
consent to join form.  Second Suppl. Turner Decl. ¶ 6, Dkt. No. 44.  Counsel also represented that,
as of July 25, 2017, there were a total of 1,038 opt-ins, 20 exclusions, and 4 objections.  *Id.*  This
latter representation conflicts with the Supplemental Declaration of the Claims Administrator, who
declared there were 31 timely (and 3 untimely) requests for exclusions as of June 29, 2017.  Suppl.
Patton Decl. ¶ 5.

There are 3,519 California Class members who cleaned CorePower studios in California through the SET program, 653 of whom overlap with the individuals in California who worked in the YFT program. *Id.* (both)

Notice initially was distributed to Class and Collective members on March 28, 2017. Patton Decl. ¶ 4; *see also* Turner Decl., Exs. E-F. California Class members did not receive a separate FLSA Notice. Second Suppl. Turner Decl. ¶ 5. Notice was provided by both U.S. Mail and e-mail when that information was available; the Settlement Administrator made multiple mailings when mail was returned as undeliverable. Class members who received the initial mailing had until May 30, 2017 to exclude themselves from or object to the Settlement (or thirty days from any subsequent mailing if the original mail was returned as undeliverable). FLSA Collective members were required to opt in by May 30, 2017, or thirty days from any subsequent mailing if the original mail was returned as undeliverable.

Defendant agreed to pay a Total Settlement Amount of $1,650,000.00. This was expected to represent a recovery of approximately 41% of the estimated unpaid minimum wages for California Class members' YFT workweeks, 8.6% for California Class members' SET workweeks, and 25% for the FLSA Collective members' workweeks. Turner Decl. ¶¶ 22, 25. At the conclusion of the opt-in period, only 16% of the FLSA Collective members had returned Consent to Join and Release Forms; under the distribution method contemplated by the Settlement Agreement, this participation rate meant "FLSA Collective Members would receive higher per-workweek payments than California Class Members, even though the YFT claims of the California Class are relatively stronger." Suppl. Mem. at 3. The resulting payment differential between the Participating FLSA Collective members and the Participating California Class members would have been contrary to the parties' intent and caused the Court to question the fairness of the settlement. By stipulation, the parties agreed to amend the Settlement Agreement to redistribute to FLSA Collective and Class members the portion of the FLSA Collective Share of Net Settlement Fund that exceeds the sum total of the Estimated Settlement Shares of all Participating FLSA Collective members, consistent with their proportionate shares of the Net Settlement Fund. Order on Stip. at 2.

United States District Court
Northern District of California

The Settlement Agreement authorizes Class Counsel to apply for an award of attorneys' fees in an amount not to exceed one-third of the Total Settlement Amount, plus the costs incurred in litigating this case. In the separately filed Motion for Attorneys' Fees, Class Counsel requests $550,000 in fees and $11,917.39 in costs. *See* Fees Mot.; Second Suppl. Turner Decl. ¶ 8. Class Counsel also requests an incentive payment of $10,000 to Plaintiff. *See id*. The Settlement Administrator requests costs in the amount of $69,875. Fees Mot. Finally, $7,500 will be paid to the California Labor and Workforce Development Agency, representing 75% of the total penalties allocated to the claims brought under the California Private Attorneys General Act ("PAGA"). *See* Settlement Agreement ¶ 3.1(A).[2]

After deducting the proposed fees and costs, the Net Settlement Fund is estimated to be approximately $993,183. The Settlement Agreement originally contemplated allocating 65% of the Net Settlement Fund to California Class members and 35% to FLSA Collective members; the allocation has been changed to ensure FLSA Collective members will not receive an unfair proportion of the Net Settlement Fund. *See* Order on Stip. at 2 ("The portion of the FLSA Collective Share of Net Settlement Fund that exceeds the sum total of the Estimated Settlement Shares of all Participating FLSA Collective Members (i.e., an amount equal to the difference between the FLSA Collective Share of Net Settlement Fund and the sum total of the Estimated Settlement Shares of all Participating FLSA Collective Members) (the 'FLSA Redistribution Amount') will be distributed between the Participating FLSA Collective Members and the Participating California Class Members consistent with their proportionate shares of the Net Settlement Fund."). In addition, California Class members had the option of electing to receive a gift card with a face value of twice their settlement amount; as of the date of the hearing, 542 California Class members elected to receive a gift card. Patton Decl. ¶ 9; Order on Stip. at 2-3 (the value of the gift card will be increased by double the portion of the FLSA Redistribution Amount).

Participating Class members release Defendant from all California Labor Code and FLSA

---

[2] The Settlement Agreement also earmarked $10,000 to cover any errors and omissions by the Claims Administrator. This amount will revert to the Net Settlement Funds if no claims are made.

claims there were or could have been pleaded to the extent they are based on the same facts and circumstances as the claims brought here. *See* Settlement Agreement ¶ 3.6(A) (endorsement language on settlement checks). Participating Collective members release Defendant from all FLSA claims that were alleged, related to, or that reasonably could have arisen out of the same facts alleged here, and that arise out of services rendered as part of the YFT Program. *Id.* ¶ 3.6(A) & (B).

Unclaimed funds for the California Class are non-reversionary. Uncashed checks mailed to FLSA Collective members who opted in to the Settlement will revert to CorePower if they have not been cashed within 90 days.

## DISCUSSION – FINAL APPROVAL

### A. Legal Standard

The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Nonetheless, "[t]he claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). "The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008) (citation omitted). "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998).

Additionally, Rule 23(e) requires the Court to determine whether the proposed settlement "is fundamentally fair, adequate, and reasonable." *Id.* at 1026; Fed. R. Civ. P. 23(e)(2) ("If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate."). To assess whether a settlement proposal is fair, adequate, and reasonable, the Court must generally balance a number of factors, including:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the state of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

6

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citations omitted). Where a settlement agreement is negotiated prior to formal class certification, it is subject to a higher level of scrutiny, and a court's approval order must ensure that the settlement is not the product of collusion among the negotiating parties. *Id*. at 946-47. But, "[g]enerally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Ching v. Siemens Indus., Inc.*, 2014 WL 2926210, at *4 (N.D. Cal. June 27, 2014).

**B.     Class Certification**

Final approval of a class action settlement requires, as a threshold, an assessment of whether the class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b). *See Hanlon*, 150 F.3d at 1019, 1022. Because no new facts that would affect these requirements have arisen since the Court preliminarily approved the Class on February 14, 2017, this Order incorporates by reference its prior analysis under Rules 23(a) and (b)(3) as set forth in the Preliminary Approval Order. *See* Prelim. Approval Order at 12-15. The Court affirms its previous findings and certifies the California Class.

**C.     Adequacy of Notice**

Rule 23(e) requires that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). The notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S. 306, 314 (1950) (citations omitted); *see also Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 624 (9th Cir. 1982) ("The class must be notified of a proposed settlement in a manner that does not systematically leave any group without notice." (citation omitted)). "Rule 23(e) requires notice that describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015) (internal quotation marks omitted). The Court's role in reviewing a proposed settlement is to represent those class members who were not parties to the settlement negotiations and

7

agreement. *See, e.g.*, *S.F. NAACP v. S.F. Unified Sch. Dist.*, 59 F. Supp. 2d 1021, 1027 (N.D. Cal. 1999).

The Court approved the form and content of the revised proposed Class Notice which Claims Administrator SSI mailed to Class and Collective members. *See* Prelim. Approval Order. The Court also approved the Notice Plan as set forth in the Settlement Agreement. *Id.* SSI sent hard copy notices to a total of 14,873 Class and Collective members, and sent email notices to 13,689 Class and Collective members. Patton Decl. ¶ 4. The notice process described in the Patton Declaration comports with the Notice Plan. Moreover, SSI employed several quality control measures to locate Potential Class and Collective members, including checking lists of addresses against the National Change of Address database and performing computerized locator traces to locate Potential Class and Collective members when USPS returned their Notice Packets as undeliverable. *Id.* ¶ 5. The Settlement Administrator represents 33 Class members and 18 FLSA Collective members did not receive any successful notice attempt. Patton Decl. ¶ 5; Suppl. Patton Decl. ¶ 12.

With respect to those California Class members whose Notice Packets were not delivered, Rule 23 does not require actual notice of settlement to class members in time to opt out of the class; rather, due process requires notice be given in a manner "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314-15, 319 ("Therefore notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objections sustained would inure to the benefit of all. We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable."); *see also Silber v. Mabon*, 18 F.3d 1449, 1454-55 (9th Cir. 1994) (concluding, under *Mullane* and other precedent, that "the appropriate standard is the 'best notice practicable'"—not actual notice). Under the circumstances, the Court finds SSI's method of providing notice to Class members was the best practicable means of apprising Class members of the Settlement. *See Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673, 680 (N.D. Cal. 2016) (finding notice by U.S. Mail best notice available under the circumstances). Consequently, notice was adequate

8

as of May 16, 2016.[3]

**D.      Fairness, Adequacy, and Reasonableness**

The Court preliminarily found the Settlement "fair, reasonable, and adequate" under Rule 23(e)(2).  Prelim. Approval. Order.  The preliminary approval stage is "an 'initial evaluation' of the fairness of the proposed settlement made by the court on the basis of written submissions and informal presentation from the settling parties." *In re High-Tech Emp. Antitrust Litig.*, 2013 WL 6328811, at *1 (N.D. Cal. Oct. 30, 2013) (citation omitted).  The Court now examines the Settlement Agreement anew to ensure it is "fair, reasonable, and adequate" in light of the *In re Bluetooth* factors.  654 F.3d at 946.  When settlement occurs before formal class certification, settlement approval requires a higher standard of fairness in order to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the class.  *See Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012).

1.      *In re Bluetooth* Factors

*The strength of Plaintiff's case.*  Where plaintiffs face significant barriers to succeed on the merits, such as establishing the existence of an employer-employee relationship, the first *Bluetooth* factor favors settlement.  *See Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010).  Courts "may presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery." *Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832, at *9 (N.D. Cal. Apr. 22, 2010).  "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Ching*, 2014 WL 2926210, at *4 (internal quotation marks omitted).  The Court need not "'reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce

---

[3] During a telephonic hearing regarding the proposed Amendment to the Settlement Agreement, Counsel for Plaintiff argued it was not necessary to issue a second notice of settlement to inform Settlement Class and FLSA Collective members of the Amendment because all participating Class and Collective members would receive amounts greater than the approximate amounts indicated in their Notices.  *See* Sept. 7, 2017 FTR at 11:05.

1    consensual settlements.'" *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods.*

2    *Liab. Litig.*, 229 F. Supp. 3d 1052, 1064-65 (N.D. Cal. 2017) (quoting *Officers for Justice*, 688

3    F.2d at 625).

4         To prevail on the merits of this action, Plaintiffs would need to prove that CorePower

5    employed both YFT and SET Cleaners, that CorePower's remuneration of the cleaners violated

6    the FLSA and California wage and hour laws, and that requiring SET Cleaners to purchase yoga

7    memberships resulted in subminimum wages under California wage and hour law. CorePower

8    contends YFT Cleaners were properly classified as independent contractors, not employees, and

9    that SET Cleaners voluntarily purchased discounted memberships because of their interest in

10    yoga.[4] Because Plaintiff would face significant barriers to succeed on the merits, this factor favors

11    final approval.

12         *The risk, expense, complexity, and likely duration of further litigation.* Difficulties and

13    risks of litigating weigh in favor of approving a class settlement. *See Rodriguez v. W. Publ'g*

14    *Corp.*, 563 F.3d 948, 966 (9th Cir. 2009). Should final approval be denied, CorePower will

15    continue to deny liability, and Plaintiff will be forced to litigate the merits of his claims in a

16    nation-wide FLSA Collective Action and a California Class Action comprising two differently-

17    situated groups. While there are no facts before the Court to suggest this litigation will be

18    particularly expensive, complex, or lengthy, there is no doubt litigation would be hard fought and

19    costly, and as indicated above, the outcome of the case on the merits is not clear. Even if Plaintiff

20    ultimately prevailed on his claims, an appeal would delay recovery to Collective and Class

21    members and might increase the fees Class Counsel would seek to recover from any ultimate

22    award. This factor therefore also favors final approval.

23         *The risk of maintaining class action status throughout the trial.* Absent settlement,

24    CorePower would oppose a motion for class certification. Plaintiff would need to overcome

25    CorePower's argument that some of the threshold issues, such as whether SET Cleaners were

26

27    [4] In fact, some of the Potential Class members who objected to and/or excluded themselves from
     the Settlement expressed both these viewpoints. Patton Decl., Ex. B at ECF pp. 35-39; Suppl.

28    Patton Decl., Ex. A at ECF pp. 13, 29, 32, 44.

United States District Court
Northern District of California

coerced into buying memberships, present individualized questions that are not appropriately resolved on a class-wide basis. In its Preliminary Approval Order, the Court noted the material risks Plaintiff faced in proving liability on a class-wide basis. The bases for Class members' objections and exclusions to the Settlement underscore this risk. *See supra*; *see also* Certification Mot. at 19 ("[O]bjectors have taken issue with the premise of Plaintiff's lawsuit, as they wish to continue participating in CorePower's YFT and SET programs. . . ."). This factor favors final approval.

*The amount offered in settlement.* At the Preliminary Approval stage, Class Counsel estimated that, before deducting for fees and costs, California Class members who were YFT Cleaners would receive $9.34 per workweek, California Class members who were SET Cleaners would receive $1.17 per workweek, and FLSA Collective members would receive $4.60 per workweek. Sagafi Decl. ¶ 34, Dkt. No. 11. Counsel represented that, without factoring in liquidated damages, this recovery amounted to 41% of the estimated unpaid minimum wages for the California YFT Cleaner workweeks, 8.6% of the estimated unpaid minimum wages for the SET Cleaner workweeks, and 25% of the estimated unpaid minimum wages for the FLSA Collective workweeks. Prelim. Approval Mot. at 5, Dkt. No. 10; Sagafi Decl. ¶ 38.

Pursuant to the revised distribution framework (*see supra* at 3-5), Counsel estimates that California YFT Cleaners will receive $7.00 per workweek, SET Cleaners will receive $0.87 per workweek, and FLSA Collective members will receive $2.78 per workweek. Suppl. Mem. at 4 & n.3. In addition, almost 550 California Class members elected to receive their settlement amount in the form of a gift card, which doubles the amount of their settlement award. Patton Decl. ¶ 9.

"It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (citation omitted). In light of the significant risks of continued litigation, especially with respect to securing class certification, and based on Plaintiff's Counsel's endorsement of the settlement (*see* below), the Court does not find that the cash settlement in this instance renders the settlement inadequate or unfair. *Cf. Hunt v. VEP Healthcare, Inc.*, 2017 WL 3608297, at *1 (N.D. Cal. Aug. 22, 2017) (denying preliminary

approval of class and collective action settlement where workers would recover approximately 4% of amount allegedly owed to them: "If a defendant is to receive a discount of this magnitude, there must be good reasons why. And those reasons must be explained thoroughly. . . .").

*The extent of discovery completed and the state of the proceedings.* Courts often "look to the amount of exchanged information prior to settlement to determine whether the parties have made an informed decision to settle the case." *Willner v. Manpower Inc.*, 2015 WL 3863625, at *4 (N.D. Cal. June 22, 2015) (citation omitted). Although no formal discovery took place in this matter, Class Counsel spent significant time investigating the claims and interviewing Plaintiff and other Class members; the parties also exchanged information pre-filing and participated in private mediation. Turner Decl. ¶¶ 14-16. This factor also weighs in favor of final approval.

*The experience and views of counsel.* The experience of Class Counsel also weighs in favor of final approval. "Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). Class Counsel are experienced class action attorneys who have been qualified as lead class counsel by other California courts, both in employment wage and hour litigation and in other types of cases. *See* Sagafi Decl. ¶¶ 5, 10. Based on their experience and their knowledge of the current case, Class Counsel endorses the Settlement as fair, adequate, and reasonable. This too weighs in favor of final approval.

*The presence of a governmental participant.* Although no governmental entity is a party to these proceedings, the United States and California Attorneys General were notified of the settlement pursuant to the notice provisions of CAFA. *See* 28 U.S.C. § 1715. No federal or state official has objected to or raised concerns about the Settlement.

*The reaction of the class members to the proposed settlement.* "[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision*, 559 F. Supp. 2d at 1043 (citation omitted). According to the Claims Administrator, four persons objected to the Settlement, and 34 requested to be excluded from the Settlement. Thus, while there were some dissenting voices, the objectors represent a small percentage of the Class. This

1    factor favors final approval.

2        In summary, having considered the *In re Bluetooth* factors, the Court finds they weigh in

3    favor of settlement.

4        2.    <u>Potential Collusion</u>

5        Where a settlement is reached prior to class certification, courts must also consider whether

6    the settlement is the product of collusion among the negotiating parties.  *In re Bluetooth*, 654 F.3d

7    at 947.  The parties reached an agreement in principle when they participated in a formal private

8    mediation, then spent several weeks negotiating the details of the Settlement Agreement and the

9    class notice.  The presence of a mediator strongly suggests the absence of collusion or bad faith by

10   the parties or counsel.  *See Chun-Hoon*, 716 F. Supp. 2d at 852; *Satchell v. Fed. Express Corp.*,

11   2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in

12   the settlement process confirms that the settlement is non-collusive.").  The Court previously

13   found this type of arms-length negotiation weighed in favor of preliminary approval (Prelim.

14   Approval Order at 16-17) and finds this to be the case again on final approval.

15       In addition to the procedure by which the parties arrived at their settlement, the Court must

16   also look for other signs that may demonstrate collusion, including (1) when counsel receive a

17   disproportionate distribution of the settlement, or when the class receives no monetary distribution

18   but class counsel are amply rewarded; (2) when the parties negotiate a "clear sailing" arrangement

19   providing for the payment of attorneys' fees separate and apart from class funds, which carries the

20   potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for

21   counsel accepting an unfair settlement on behalf of the class; and (3) when the parties arrange for

22   fees not awarded to revert to defendants rather than be added to the class fund.  *In re Bluetooth*,

23   654 F.3d at 947.  As to the first factor, the monetary distribution to the Class constitutes

24   approximately 60% of the Total Settlement Amount, while Class Counsel will receive up to one-

25   third of the Total Settlement Amount.  As discussed below, one-third is not necessarily

26   disproportionate, though it does exceed the 25% benchmark in the Ninth Circuit.  As to the second

27   factor, the Settlement Agreement contains a clear sailing provision in which CorePower agrees not

28   to object to Class Counsel's request for fees constituting up to one-third of the Total Settlement

Amount. Nevertheless, because the fee will be awarded from the same common fund as the recovery to the Class, this particular clear sailing provision does not signal the possibility of collusion. *See In re High-Tech Emp.*, 2015 WL 5158730, at *14 (where attorneys' fees will be awarded from the same common fund as the recovery to the class, where counsel did not negotiate fees separate and apart from class funds, and where no portion of the common fund would revert to defendant, clear sailing provision did not signal possibility of collusion). And as to the third factor, it only applies to a minimal degree. No money allocated to the Class will revert to Defendant; instead, any residual amount that is too small to be redistributed to Class members will be paid to a *cy pres* recipient, the National Employment Law Project ("NELP"). The Court previously found NELP has a "driving nexus" to the members of this wage and hour employment class. Prelim. Approval Order at 18-19. The only money that will revert to Defendant are checks that have been mailed to FLSA Collective members (who by definition have opted in to the Collective), which have not been cashed within 90 days of mailing.

In sum, the Court finds these facts do not raise an inference of collusion.

3.   <u>Summary</u>

Given the foregoing analysis, the Court finds that even under heightened scrutiny, the Settlement Agreement is fair, reasonable, and adequate to warrant final approval.

**DISCUSSION – FLSA COLLECTIVE**

The Court conditionally certified the FLSA collective action. Prelim. Approval Order at 23-24. The standard for certification of an FLSA collective action is "not as stringent a standard" as that for certification of a class under Rule 23. *See Tijero v. Aaron Bros., Inc.*, 301 F.R.D. 314, 323 (N.D. Cal. 2013) (citing *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1003 (N.D. Cal. 2010)). For the same reasons identified above, the Court finds the settlement of the FLSA Collective, as revised by the parties on September 27, 2017, "constitutes a 'fair and reasonable resolution of a bona fide dispute,' and approves it." *Sarkisov v. StoneMor Partners L.P.*, 2015 WL 5769621, at *3 (N.D. Cal. Sept. 30, 2015) (quoting *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982)).

## DISCUSSION – ATTORNEYS' FEES AND COSTS

**A.      Attorneys' Fees**

Plaintiffs' counsel requests $550,000 in fees.  At the Preliminary Approval hearing, Class Counsel represented it expected its final lodestar to be approximately $220,000, which would represent a multiplier of 2.3.  The Court found this multiplier was within the range of reasonableness for purposes of preliminary approval but "expressed some concern that 33 and 1/3 % of the Total Settlement Fund represents an unwarranted upward departure from the norm." Prelim. Approval Order at 19.  Since that time, Class Counsel performed additional work in responding to Class and Collective members, moving for final approval, and responding to inquiries from the Court.  Class Counsel represents its current lodestar amounts to $403,643 and its total costs are $11,917.39; the requested fees now represent a multiplier of 1.36.  Second Suppl. Turner Decl. ¶ 8.

1.      Legal Standard

Courts have discretion to award attorneys' fees to a prevailing plaintiff if: "(1) fee-shifting is expressly authorized by the governing statute; (2) the opponents acted in bad faith or willfully violated a court order; or (3) the successful litigants have created a common fund for recovery or extended a substantial benefit to a class." *In re Bluetooth*, 654 F.3d at 941.  An award of attorneys' fees is authorized in this case by the governing statutes,[5] and because Plaintiff has created a common fund for recovery and extended a substantial benefit to the class.  Nonetheless, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Id.* (citations omitted).

In this circuit, there are two primary methods used to calculate reasonable attorneys' fees: the lodestar method and the percentage-of-recovery method.  *In re Online DVD-Rental*, 779 F.3d at 949.  Courts have the discretion to award fees employing either method.  *In re Bluetooth*, 654

---

[5] The California Labor Code provides for the recovery of reasonable attorneys' fees and costs in connection with the claims Plaintiff asserted in this action.  *See* Cal. Lab. Code § 1194(a) (in actions to recover minimum wage or legal overtime compensation); *id.* § 2802(c) (in actions for reimbursement of necessary expenditures).

F.3d at 942 (citation omitted). Whichever method they choose to employ, courts should cross-check the fees awarded using the second method. *Id*. at 944-45. In evaluating the reasonableness of a percentage-of-fund award or a lodestar, courts consider the following factors:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). The most important factor is the benefit counsel obtained for the class. *In re Bluetooth*, 654 F.3d at 942. Finally, "the lack of objection from any Class Member supports the attorneys' fees award." *In re Immune Response*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007).

The Court analyzes Class Counsel's request for fees under percentage-of-funds method and confirms the result by applying a lodestar analysis.

### 2. Percentage of Funds Analysis

In the Ninth Circuit, the "benchmark" percentage for an award of attorneys' fees in a class action is 25%. *In re Bluetooth*, 654 F.3d at 942. This "benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). In this case, several factors balance each other out to suggest that the benchmark percentage is appropriate.

Class Counsel is experienced in this type of litigation and handled the matter on a purely contingent basis starting at the latest in January 2016 when it sent CorePower a letter notifying it of Plaintiff's claims. Sagafi Decl. ¶ 25. The parties settled this case before filing suit. In all likelihood, this was a more economic approach than litigating the case aggressively before exploring pre-suit resolution; however, it also means Class Counsel did not need to expend as

1  many resources to resolve the action.

2        Class Counsel obtained monetary compensation for Class and Collective members in a

3  case involving significant litigation risks and in which certification was not an obvious outcome.

4  *See supra*. But it is not evident whether Collective and Class members believe the lawsuit was in

5  their best interest: only 16% of potential FLSA Collective members who received notice by mail

6  and/or email opted into the Settlement, and it remains to be seen how many Class members will

7  cash their Settlement Checks. Indeed, one potential Class member requested to be excluded

8  because the claims were "ridiculous" and another because cleaners had been "more than

9  adequately compensated for" their services and "in no way feel entitled to monetary

10  compensation." Patton Decl., Ex. A at ECF pp. 14, 25. Others objected to the Settlement because

11  they were "clearly told, both verbally and in writing, that [their] cleaning services would be

12  compensated only in a trade for unlimited yoga classes in the week of [their] cleaning work . .

13  .[this] deal was fair and honestly [they feel they] got the better end of the bargain." Patton Decl.,

14  Ex. B at ECF pp. 35-36. Others felt it was "unfortunate to see CPY being sued for something that

15  was such a wonderful gift." *Id*. at ECF p. 37; *see also* Suppl. Patton Decl., Ex. A at ECF pp. 32,

16  44; Suppl. Br., Dkt. No. 20.[6] Moreover, Plaintiff's characterization of the recovery of $0.87 per

17  workweek for SET Class members[7] as "highly favorable" (Fees Mot. at 5) does not resonate

18

---

19  [6] Plaintiff correctly notes that employers are not free to accept free labor, even from workers who
20  are willing to work for no pay. Cert. Mot. at 19 (citing *Tony & Susan Alamo Found. v. Sec'y of
   Labor*, 471 U.S. 290, 295 (1985)). But *Tony and Susan Alamo Foundation* is distinguishable.
21  First, the volunteers in that case received food, shelter, clothing, transportation and medical
   benefits, which the Supreme Court described as "simply wages in another form" and used as a
22  basis for finding the volunteers were employees. *Alamo Found.*, 471 U.S. at 293-94. Here, it is
   not evident that purchasing discounted memberships would be earning "wages in another form."
23  Second, and more important, there has been no finding that the SET and YFT Cleaners were
   employees of CorePower: CorePower denies all liability and wrongdoing, and agreed to settle the
24  action only "to avoid the burden, expense, and uncertainty of continued litigation." Settlement
   Agreement at 1. CorePower asserts that YFT Cleaners were independent contractors and that SET
25  Cleaners voluntarily purchased their memberships as a benefit. *See* Fees Mot. at 5; Suppl. Br. iso
   Prelim. Approval at 2-3, Dkt. No. 20.
26

27  [7] This represents significantly less than 8.6% of their estimated unpaid minimum wages. Class
   Counsel represented this allocation was "fair and reasonable because it reflects the lower potential
28  damages, weaker claims, and greater class certification risks for the SET claims. Whereas YFT

loudly with the Court. *See also* Turner Decl. ¶ 22 (estimated recovery of $1.17 per workweek for Class members who were SET Cleaners is 8.6% of estimated unpaid minimum wages, *before* deducting proposed fees and costs).

No Class members objected specifically to the proposed fee award. Patton Decl.; Suppl. Patton Decl.

However, the Court was required to involve itself numerous times to obtain sufficient information and/or clarification from Plaintiff's Counsel. *See, e.g.*, Order re: Hearing, Dkt. No. 17 (Plaintiff did not sufficiently address several factors relevant to preliminary approval, did not clearly explain gift card procedures, etc.); Suppl. Br., Dkt. No. 20 (addressing additional questions from Court regarding obvious deficiencies in settlement, preferential treatment, and reasonable range of approval); Order re: Motion for Final Class Cert., Dkt. No. 32 (addressing discrepancies between declarations); Suppl. Turner Decl. ¶ 4, Dkt. No. 34 (acknowledging errors); Suppl. Br. Order, Dkt. No. 42 (asking whether 16% participation rate for FLSA Collective meant YFT Cleaners outside of California who were Participating FLSA Collective members would receive significantly greater settlement than California YFT Cleaners whose claims counsel generally considered more valuable, and questioning whether this was fair); Second Suppl. Turner Decl. ¶ 6 (responding to Court's questions raised during Fairness Hearing, but providing erroneous information re total number of exclusions); Order Setting Telephonic Hearing, Dkt. No. 45 (setting hearing to discuss mechanics of proposed change in "unclaimed funds," which Plaintiff did not address in the Suppl. Mem.).

For these reasons, the Court does not find it appropriate to award attorneys' fees in an amount greater than the 25% benchmark.

### 3. Lodestar Comparison

The lodestar represents a reasonable hourly fee multiplied by the number of hours

---

Cleaners were not paid any wages for their work, SET Cleaners were paid at an hourly rate at or above the applicable minimum wage. Plaintiff alleges that SET Cleaners were required, as a condition of employment, to pay for discounted CorePower memberships that brought their pay below the minimum wage." Suppl. Br. iso Prelim. Approval at 2-3; *see also supra*.

reasonably expended on the litigation. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The lodestar figure is presumptively reasonable. *Clark v. City of L.A.*, 803 F.2d 987, 990 (9th Cir. 1986). The lodestar comparison in this case confirms 25%, rather than 33%, of the Total Settlement Amount is warranted for attorneys' fees.

       *a.      Hourly Rate*

       To determine the appropriate lodestar amount, courts first assess the reasonableness of the hourly billing rate. *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). To determine whether rates are reasonable, courts must identify the relevant community and assess the prevailing hourly rate in that community for similar services by lawyers of reasonably comparable skill, experience, and reputation. *See id.* at 979. "Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." *Id.* Here, the relevant community is the San Francisco Bay Area, and the reasonableness of rates charges should therefore be determined by reference to the rates charged by Bay Area attorneys with commensurate skill, experience, and reputation.

       Plaintiff seeks an hourly rate of between $200 and $775 per hour depending on the particular support staff, attorney, or partner. Second Suppl. Turner Decl. Ex. B. Class Counsel described the skill, experience, and reputation of the attorneys and support staff who worked on the matter. Sagafi Decl. ¶¶ 6-19 (describing experience of Sagafi, Eiland, and Turner); Turner Decl. ¶¶ 4-13 (describing experience of Turner, Sagafi, Eiland, Schrum-Herrera, and Levinson). The range of rates requested for the attorneys and support staff identified in the declarations is in line with the overall range of market rates in this District for attorneys and for litigation support staff of similar abilities and experience. *See Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010) (district court did not abuse its discretion in awarding 2008 hourly rates for Bay Area attorneys of up to $875 for a partner, $700 for an attorney with 23 years of experience, $425 for an attorney with approximately five years of experience, and $190 for paralegals); *see also Gutierrez v. Wells Fargo Bank, N.A.*, 2015 WL 2438274, at *5 (N.D. Cal. May 21, 2015) (finding reasonable rates for Bay Area attorneys of between $475-$975 for partners, $300-$490 for associates, and $150-$430 for litigation support and paralegals). Under the circumstances, the

19

Court is satisfied the hourly rates requested for the work performed by Sagafi, Eiland, Turner, Schrum-Herrera, and Levinson fall within the range of reasonable fees.

But Class Counsel also seeks to recover fees for the work performed by seven attorneys and eight support staff members whose experience was not described by Sagafi or Turner. *See* Second Suppl. Turner Decl., Ex. B. Counsel provided the biographical information for the attorneys and staff "with primary involvement in" the case, and offered to provide supplemental information to the Court. Turner Decl. ¶ 13 & n.2.[8] While this approach may have been appropriate if the unidentified staff performed minimal work, the work performed by the seven attorneys and eight support staff Counsel never described amounts to almost $89,000. *See* Second Suppl. Turner Decl., Ex. B. Counsel should not place the onus upon the Court to ensure the Fees Motion is adequately supported. The lack of information about these individuals prevents the Court from ascertaining whether their experience warrants the fees charged, which range from $230 for "Part-Time Paralegal" to $650 for Nantiya Ruan.

### b. Hours Expended

Beyond establishing a reasonable hourly rate, a party seeking attorneys' fees bears the burden to "document[ ] the appropriate hours expended." *Hensley*, 461 U.S. at 437. Such an applicant must exercise sound "billing judgment" as to the number of hours worked, eliminating excessive, redundant, or unnecessary hours, and provide billing records supporting the time claimed. *Id.* at 433-34. Class Counsel "is not required to record in great detail how each minute of his time was expended," but should "identify the general subject matter of his time expenditures." *Id.* at 437 n.12; *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000) (quoting *id.*). From the inception of the matter until August 11, 2017, Class Counsel declares they have spent 1,163 hours litigating the case. Second Suppl. Turner Decl. ¶ 8 & Ex. B. Counsel declares staffing and billing were handled in a reasonable manner, but only "identif[ies] the general subject matter of [ ] time and expenditure" in the most abstract manner; Counsel does not

---

[8] Not only does Counsel fail to describe the experience of these individuals, but Counsel fails to even name some of them: Counsel seeks to recover $9,432 in fees billed by "San Francisco Law Clerk" and $1,725 in fees billed by "Part-Time Paralegal." Second Suppl. Turner Decl., Ex. B.

provide any details as to how those hours were spent.  *See* Turner Decl. ¶¶ 37-39, 43 & Ex. H; Second Suppl. Turner Decl. ¶ 8 & Ex. B.  The Court has no reason to believe the reported hours are unreasonable under the circumstances, but again, Counsel's submissions do not permit the Court to make such a finding.  To that end, Counsel's submissions do not support an upward modification from the 25% benchmark fee award.

> c.  *Enhancement or Multiplier*

Class Counsel calculates the lodestar fee for the work performed is $403,643.  Second Suppl. Turner Decl. ¶ 8 & Ex. B.  Class Counsel's request for $550,000 amounts to a multiplier of 1.36.  *Id.* ¶ 8.

### 4.  Conclusion

The circumstances of this case do not warrant an upward departure from the 25% benchmark, and do not warrant a lodestar multiplier.  The lodestar comparison – to the extent Counsel has provided sufficient information for the Court to perform it – confirms this amount is appropriate.  The Court in its discretion accordingly grants Plaintiff's motion in part and awards it attorneys' fees in the amount of $412,500, an amount just above Counsel's lodestar.  The difference between this amount and the fees requested will be added to the Net Settlement Fund.  Settlement Agreement ¶ 3.2(b).

## B.  Class Counsel Costs

Class Counsel seeks to recover $11,917.39 in disbursed costs.  *See* Turner Decl. ¶ 50 & Ex. I; Second Suppl. Turner Decl., Ex. B at ECF p. 3.  The bulk of the requested costs are for mediation fees, computer research, court fees and travel.  *Id.* (both).  As with their attorneys' fees, Counsel provides no detail to support these requests.  *Id.* (both).  Counsel represents these costs were necessary and reasonable, and expended solely for the benefit of the Class.  Fees Mot. at 14.  Class Counsel previously requested $785 in "Court fees"; the Court asked counsel to explain what accounted for the $80.00 that Counsel requested above the $705 listed on the docket.  *See* Order ¶ 7, Dkt. No. 32.  Class Counsel provided that explanation.  Suppl. Turner Decl. ¶ 6.  Class Counsel now seeks a total of $1,001.50 in Court fees, but again fails to provide any explanation for the additional $216.05 fee request.  Second Suppl. Turner Decl., Ex. B at ECF p. 3.  Absent any

21

reasons for the increased request, the Court cannot ascertain whether the costs were incidental and necessary to the representation, and therefore reimbursable. *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994); *Millan v. Cascade Water Servs., Inc.*, 2016 WL 3077710, at *12 (E.D. Cal. May 31, 2016). The request for costs is denied without prejudice; Class Counsel may submit a detailed explanation supporting its cost request within one week of the date of this Order.

## C.     Service Award

Courts have the discretion to approve service or "incentive" awards to representative plaintiffs in class actions as compensation for their time and effort for the benefit of others, and for having undertaken the risks inherent in serving as a named plaintiff. *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003). In evaluating the reasonableness of a requested award, courts should consider factors such as "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, [and] the amount of time and effort the plaintiff expended in pursuing the litigation." *Staton*, 327 F.3d at 977 (internal punctuation and citation omitted). Additionally, courts focus on the number of class representatives, the average incentive award permitted by courts, and the proportion of the entire settlement that is spent on the incentive award. *In re Online DVD-Rental*, 779 F.3d at 947 (approving a $5,000 incentive award for each of nine class representatives even where each class member only received $12). A $5,000 service award is squarely within the range of what other courts in this District have approved. *See, e.g.*, *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 592 (N.D. Cal. 2015) ("[I]n this district, a $5,000 incentive award is presumptively reasonable.").

The terms of the Settlement Agreement provide that Plaintiff should receive a service award of $10,000 to compensate him for his efforts on behalf of the Class and Collective. In granting preliminary approval, the Court noted the proposed award appeared excessive in light of how little Plaintiff had to do in this case, which settled before Plaintiff filed suit. Prelim. Approval Order at 20. For purposes of preliminary approval, the Court nonetheless found this amount reasonable and noted Class Counsel would file a motion for attorneys' fees and costs to establish the reasonableness of the Service Award prior to final approval. Plaintiff argues he is

entitled to a $10,000 service award because he "provided Class Counsel with documents and information, assisted Class Counsel in understanding documents and data produced by CorePower, described CorePower's policies and practices regarding Class members' job duties, was available by phone and contributed to Class Counsel's arguments in the full-day mediation, and reviewed and approved the Settlement Agreement." Fees Mot. at 16. He also was in contact with Class Counsel about the progress of the case and strategic issues as they arose. *Id.* The Court does not find that this level of participation, without more, warrants doubling the standard fee award to a class representative.

But Plaintiff also "took on considerable reputational risk with respect to his current and future employers." *Id.*; *see also* Turner Decl. ¶ 35. Plaintiff declares that he "believe[s] other yoga studios may be reluctant to hire him because [he is] viewed as a 'troublemaker'" as a result of filing this lawsuit. Walsh Decl. ¶ 4, Dkt. No. 44-1. He declares his ability to find employment has already been adversely affected by his decision to lead this suit. For instance, a Google search of his name and "yoga" turns up several articles about the lawsuit: "Given that potential employers are likely to research new hires online, I suspect that my actions in this case are likely to have dimmed my prospects for employment just based on Google results alone." *Id.* ¶ 6. Another studio owner also told him that "the fact [he] had sued another yoga studio was a concern to her" and Walsh "feel[s] that the fact [he] was a plaintiff in a case against a yoga studio had a detrimental effect on my relationship with her studio." *Id.* ¶ 7. He "suspect[s]" the owner began to "unduly scrutinize[]" his conduct and "treat[] him differently" after learning of the fact. *Id.* ¶ 8. As the authorities Plaintiff cites in the Fees Motion demonstrate, courts recognize the "unique risks" named plaintiffs in employment class actions face with respect to future employment. *See* Fees Mot. at 16 n.7 (citing cases awarding fees between $2,500 and $25,000 based on contributions to lawsuit and risk of retaliation or potential impact on future employment).

The Court accordingly approves a $10,000 service award for Plaintiff.

**D. SSI's Administrative Fees**

Plaintiff requested, and the Court preliminarily approved, paying Claims Administrator SSI $69,875 for administration costs. *See* Prelim. Approval Order at 6, 22-23. After Plaintiff filed

his Fees Motion, the Court asked him to provide a declaration from SSI documenting the reasonableness of the fees requested. Suppl. Br. Order at 2, Dkt. No. 32. SSI provided the requested declaration; SSI also explained that due to a number of factors, the revised fee estimate for administering the case will be approximately $121,966 – almost 75% more than the amount the Court preliminarily approved. Suppl. Patton Decl. ¶¶ 8-11. Plaintiff asks the Court to approve the payment of the original $69,875 requested to administer the Settlement. *See* Cert. Mot. at 22.

Based on Mr. Patton's Supplemental Declaration, the Court approves payment of $69,875 to the Claims Administrator as reasonable.

### CONCLUSION

In summary, the Court **GRANTS** the Certification Motion and certifies the California Class; grants final approval of the Settlement Agreement as amended on February 6, 2017 (Dkt. No. 30-2) and September 18, 2017 (Dkt. Nos. 50, 51); and certifies the FLSA Collective.

The Court also **GRANTS IN PART** the Fees Motion and approves payment of $412,500 in attorneys' fees to Class Counsel; payment of $10,000 as a service award to William Walsh; and payment of $69,875 to SSI for the costs of administering the Settlement.

The Court **DENIES WITHOUT PREJUDICE** the requests for costs. No later than October 10, 2017, Class Counsel may submit a detailed explanation supporting its cost request.

The Court schedules a status conference for February 22, 2018 at 10:00 a.m. The parties shall file a joint status report a week before the status conference describing any issues they believe should be addressed at the status conference, outlining a proposed course of conduct for remedying such issues, and indicating the percentage of Class and Collective members who have cashed settlement checks up to that point.

**IT IS SO ORDERED.**

Dated: October 3, 2017

_____
MARIA-ELENA JAMES
United States Magistrate Judge